CLARK, Secretary of State, et al. v.
ATLANTIC PIPE LINE CO.

No. 8837.

Court of Civil Appeals of Texas. Austin.
Nov. 29, 1939.

Rehearing Denied Dec. 20, 1939.

the State of Maine, in three consolidated suits brought by appellee against the Secretary of State and other State officials under Vernon's Ann.Civ.St.Art. 7057b, to recover certain taxes for the years 1933 to 1938, both inclusive, paid by appellee under protest and claimed by the Secretary of State to be due under Vernon's Ann.Civ.St. Art. 7084.

Art. 7084 provides that "every domestic and foreign corporation heretofore, or hereafter chartered or authorized to do business in Texas, shall * * * pay * * * a franchise tax * * * based upon that proportion of the outstanding capital stock, surplus and undivided profits, plus the amount of outstanding bonds, notes and debentures, other than those maturing in less than a year from date of issue, as the gross receipts from its business done in Texas bears to the total gross receipts of the corporation from its entire business."

The controlling issues in the case involve the correctness of the following (substantially stated) contentions of appellee:

1. The gross receipts which formed the basis upon which the taxes in issue were computed were derived solely from interstate shipments of oil by pipe line and therefore constituted interstate commerce.

2. If the language of Art. 7084, "business done in Texas," be construed to include inter as well as intrastate business, then the statute, at least to the extent of such inclusion, is violative of the commerce clause (Art. 1, § 8) of the Federal Constitution, U.S.C.A., and therefore and to that extent is void.

3. As used in the statute, "business done in Texas," includes only intrastate business done in Texas.

4. In any event, the language, "business done in Texas," is open to construction, and having been for a number of years prior to 1937 construed by the State departments charged with its administration as not including interstate business, such construction is binding upon the courts.

In order to give an accurate picture of appellee's business, its general character, methods and practices, and the facilities with which it is conducted, we deem a somewhat extended statement essential. This statement, unchallenged as to accuracy by appellants, is taken, with some change in wording, from portions of appellee's brief. It follows:

Gerald C. Mann, Atty. Gen., and Glenn R. Lewis, C. C. Cammack, and A. S. Rollins, Asst. Attys. Gen., and Edwin D. Guinn, Franchise Tax Atty., for appellants.

Bromberg, Leftwich, Carrington & Gowan and Charles B. Ellard, all of Dallas, for appellee.

McCLENDON, Chief Justice.

This appeal is from a judgment in favor of appellee, Atlantic Pipe Line Company, a corporation chartered under the laws of

"During the years covered by these suits, the appellee had a gathering system and main trunk line system, running from the field in Hobbs, New Mexico, across Texas on down to its boat loading racks and wharves at Atreco. It likewise had gathering systems and lines in sundry West Texas fields, which connected with this main line. It had gathering systems in East Texas and a main or trunk line running from East Texas to Atreco, a point on the Texas Gulf coast below Beaumont in Jefferson County, where ocean-going vessels are docked for loading. At this point there is no city or town, no public wharf of any kind. It is simply a private loading terminal facility belonging to appellee. Appellee has a similar terminal at Harbor Island, an island on the Gulf coast, where it maintains a loading wharf for ocean-going vessels, from which oil alone is loaded. This terminal is likewise an isolated spot, where there are no public wharves or loading terminals except that the Humble Pipe Line Company maintains a similar loading terminal there. The oil shipped from Harbor Island is gathered chiefly in the Refugio Field and moved by appellee's trunk line system to Harbor Island. Appellee likewise maintains a small system for gathering and transporting oil from the Barber's Hill pool by barge to a loading dock near Cedar Bayou in Galveston Bay, thence to Texas City near Galveston, for ocean-going cargoes. During all or part of the time involved in these suits, appellee had joint tariffs with the Humble Pipe Line Company, and another with United Pipe Line Company for oil coming from Louisiana, which was transported from Louisiana into Texas, and thence to Texas coastal points for delivery on board interstate and foreign transport vessels.

"In the transportation of oil by pipe line it is not practical to keep identical barrels of the same grade of oil from different shippers, separated. Crude petroleum being fugacious, it is the common, recognized and accepted practice in the entire pipe line industry in its handling merely to keep separated the various grades so as to prevent contamination. In pipe line parlance, this is called 'common stock.' Likewise, transportation of oil by pipe line is in its very nature necessarily somewhat different in handling than ordinary solid commodities, such as are handled in railway and express traffic. Due to scattered production, individual ownership of varying sized tracts, proration laws, and other elements, the small individual, or corporate producer rarely ever attempts to transport by pipe line his own production. Usually it is sold in the field, either before or immediately after production, to some larger corporate or individual producers or refiners of oil. These latter are generally the shippers by pipe line. So that there rarely ever occurs, and it is not economical to make, small individual shipments. Shipments are usually in quantities of 25,000 barrels or more."

"Appellee's principal office is in Philadelphia, Pennsylvania, its branch office is in Dallas, Texas. It is strictly and purely a common carrier by pipe line, and does not warehouse or store oil, nor sell oil. All of the contracts for the transportation of oil in appellee's system are made in Philadelphia, through interstate communications for the movements. When the contract has been made, the details of it are conveyed by the Philadelphia office to the Dallas office, which has charge of the physical operations of the pipe line, both in Texas and in New Mexico. The great preponderant quantity of oil moved by appellee is on behalf of large shippers of oil, who have theretofore either themselves produced, or by purchase acquired the oil to be moved. With the exception of relatively small quantities transported from the East Texas field to a plant of appellee in Jefferson County, Texas (which plant was not in operation prior to 1937), and a relatively few scattered shipments that go by boat from Texas City and Atreco to Houston, Texas, all of the oil transported by appellee is put on board vessels at Texas Gulf ports, which vessels carry the oil in interstate coastwise trade to Brunswick, Georgia, and sundry points along the Atlantic seaboard in and about New Jersey and Pennsylvania, or to foreign ports in Canada, France, Spain and Italy. Approximately 99 per cent of the oil moved by appellee from points in New Mexico, Louisiana and Texas, is put on board vessels at Texas Gulf ports consigned to and actually transported to other States, and foreign ports, in a continuous movement. Less than 1 per cent of the oil transported by appellee from Louisiana, Texas and New Mexico is delivered to other points in Texas as its final destination. This oil handled by appellee, which is produced in New Mexico, Louisiana and Texas, and put on these vessels and shipped out in interstate or foreign commerce, is handled substantially in the following manner: The shipper contacts appellee's Phil-

adelphia office and advises the company that it has and wants to ship certain quantities of oil of a certain grade and from a certain field, either in Texas, Louisiana or New Mexico, on appellee's line down to on board vessels at Texas Gulf ports, consigned to definitely named parties in some other State or some foreign nation. If appellee's facilities serve the area from which the oil is to be delivered by the shipper, and if its commitments to other customers are such that it can handle the shipment, it then enters into a formal contract of shipment with the shipper. The rates charged are those prescribed by the tariff filed by appellee and approved by the Interstate Commerce Commission. The Philadelphia office then notifies the Dallas office of the fact that the contract of shipment has been made and appellee thereupon prepares what is called a tender, which instrument in general nature is the same as and takes the place of what is known in ordinary railroad transportation as a bill of lading. This tender shows the name of the consignor or shipper, the point of delivery to appellee, the name of the consignee, appellee's terminal facility on the Gulf coast of Texas at which the shipper's or consignee's vessels are to receive the oil, the state or port either in the United States or foreign nation to which the oil is to be carried by said vessel, the quantity and quality of the oil tendered to the pipe line company and to be delivered to the vessel, the number of the interstate commerce tariff on which the oil is to move, showing the tariff to be charged and services performed. This tender is executed by both the shipper and appellee. In the great majority of these shipments appellee does the gathering from the lease tanks in the field. The tariff for the entire shipment includes this charge for gathering and shiploading. There are many cases, however, in which the shipper does his own gathering and delivers the oil to appellee at some point along its main line, in which case the tariff does not include any gathering charge. If the shipment is one that appellee is required to perform the gathering services on, it connects its gathering line in the field where the oil is produced to the lease tanks and moves the oil as it is accumulated in the lease tanks down to the tanks at its receiving stations along its main trunk line. The oil is moved out of these receiving stations in large batches at regular intervals, determined by the ordinary and regular methods necessary to be used in the moving of various grades of oil through a pipe line. Due to the fact that there are various grades of oil these various shipments cannot be run indiscriminately into one tank or into the main line. If this were done, the various grades would immediately contaminate each other. As a result it is necessary in the operation of a pipe line that oil of each separate grade or character be moved in one batch. This batch may consist of 25,000, 50,000 or 100,000, or more barrels, pushed down the line all at one time. It may take several days to get one batch all going into the main line. When the requisite amount to meet the ships at the sea coast of all that grade of oil is in the main line and started down on its journey, then another grade will be put in behind the first grade and pumped down the main line to the terminal for the ships at the coast, etc. Once the oil leaves the lease tank its movement is substantially continuous on down the line without interruption, except for such interruption as necessarily occurs in the ordinary pipe line handling of oil at the receiving station up on the main line in order to keep the batches of oil in separate grades. The oil is thus pumped down the main line to the terminal at the sea port and is there received into ship loading tanks kept in separate grades to maintain its separate quality or grade. The oil is pumped from these terminal tanks by numerous lines, right on board the boats of the various consignees of the oil as the boats arrive. The ship's crew on the boats performs the act of mooring the boat to the wharf and indicating to the pipe line crew which tanks in the hold of the vessel various grades of oil are to be put into. The crew of appellee runs the hoses or lines from the loading dock or wharf up over the side of the vessel and into the tanks in the vessel, and operate and conduct the entire loading performance. Prior to the loading of the vessel the agent or ship's captain, as the case may be, designated by the shipper or consignee, or both, to make the inspection, makes the inspection of the oil, and when the same is received on board the vessel the ship's captain executes the ship's bill of lading for the cargo, showing the consignor, consignee, quantity and grade of oil and port of destination to which the oil is to be taken and delivered by the ship. Copy of these papers is furnished to appellee and kept by it as required by the rules of the Interstate Commerce Commission. The vessel then clears for the port in some

other state or foreign country with its oil. The Philadelphia office collects from the shipper the tariff charges, and it is paid to the Philadelphia office. It is not handled by the Texas office. Usually after tender has been made by the shipper and some ten or fifteen days before the vessel is scheduled to arrive, the name of the particular vessel and the date of its arrival is given to the Philadelphia Office of appellee, either by the shipper or the consignee, and this information is conveyed to the Texas office. It takes from ten to fifteen days to move any given quantity of oil from the Midland receiving station in West Texas to the Gulf coast; from five to seven days to move any batch of oil from the East Texas field to the Texas Gulf coast. There are cases of shipments and deliveries where under the express provisions of the Interstate Commerce tariff the carrier is permitted to receive oil into its system at the receiving station, and make available that same quantity of oil of the same character to a vessel at the sea port terminal of the pipe line, if, due to the vicissitudes of delayed arrivals of their vessels appellee has available that grade of oil at the coast terminal. This arrangement is made under the provisions of the Federal tariff by special contract. No more oil is pumped down through the main lines to the terminals along the Gulf coast than is necessary to meet the vessel's tender under the scheduled contracts. While there is large tankage capacity at these terminals, this tankage is strictly for the use of appellee and necessary to the handling of its pipe line problems of transportation for loading vessels. Due to occasional breakdowns in pipe lines or machinery, and to delays in vessel arrivals as a result of storms and other conditions, and due to the fact that in its very nature these sundry grades of oil cannot be run right out of the main trunk line to on board the vessel, this tankage capacity at the sea port terminals is necessarily purely as a pipe line operation. Appellee does not permit anybody to tender or ship oil from its line to be held subject to further instructions of the shipper as to point of delivery or to be transported down to the sea port and there held in storage subject to further orders of the shipper while he procures a customer or consignee."

As to the first contention: Appellee's business from the viewpoint of its inter or intrastate character, falls within three classes:

1. Shipments originating, transported exclusively, and destined ultimately to points in Texas. This constitutes less than 2% of appellee's entire business. Appellee has paid the tax thereon and it is not in controversy in this suit.

2. Shipments originating in New Mexico and transported by appellee from point of origin to seaboard points in Texas with foreign destination. This, also, constitutes a relatively small percentage of appellee's business, and is concededly interstate.

3. Shipments destined to points outside the State but transported to seaboard and loaded on ships by appellee; such shipments originating either (a) in Texas or (b) in Louisiana and delivered to appellee by connecting carriers at points in Texas. Appellee's part of the actual carriage and other handling of such shipments is performed entirely in Texas. It is as to this class of shipments that the only point of difference between appellants and appellee relates.

Appellants' contentions that appellee's handling of these class 3 shipments is not interstate commerce is predicated upon the facts that: (1) they move under local bills of lading or tenders covering only appellee's portion of the handling which is entirely intrastate; (2) the detailed course of business results in delay in transit and storage in appellee's tanks at Gulf terminals pending arrival of ships, which (they contend) interrupts the continuous movement essential to interstate transportation; and (3) the oil is mingled in appellee's pipe lines and tanks with other oil of the same grade, and not the identical oil consigned but only a like quantity and grade is delivered to the transporting vessel for transportation to ultimate point of destination. The effect of this commingling, appellants contend, is to pass the title to the oil to appellee and constitute the latter the carrier of its own oil from one point in the State to another, and interstate transportation does not begin until the oil is delivered to the vessel at the Gulf terminal.

These three contentions of appellants have been with such unanimity adversely adjudicated that only a brief statement of the effect of the holdings and citation of one or more supporting authorities is necessary.

1. As tersely stated in Honnold's "Supreme Court Law," p. 351:

"The nature of a shipment is not affected by the fact that the transaction is initiated and completed under a local bill of lading which is wholly intrastate. United States v. Erie R. Co., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187; Railroad Commission of Ohio v. Worthington, 225 U.S. 101, 108–110, 32 S.Ct. 653, 56 L.Ed. 1004; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Hughes Bros. Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359."

See also 9 Tex.Jur., pp. 272–274, § 8.

■ 2. The delays in transit and storage at the terminal wharves were only incidental to the customary and essential method of transportation of oil by pipe line and did not break the "continuity of transit" or affect the interstate character of the shipments. Carson Pet. Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626; and cases therein cited.

■ 3. Nor was the interstate character of the shipments affected by the commingling with other oil of the same grade and delivery of the quantity and grade and not the identical oil consigned. Vial case, above; Railroad Commission v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442.

Appellee's second contention is ruled, we believe, by the following, among other, decisions: Galveston H. & S. A. R. Co. v. State, 210 U.S. 217, 28 S.Ct. 638, 52 L.Ed. 1031; Puget Sound Stevedoring Co. v. State Tax Comm., 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68; Houston B. & T. Ry. Co. v. State, 108 Tex. 314, 192 S.W. 1054. We cite these specific cases because we regard them as practically on all fours with the case at bar upon the point at issue. The first of these cases held invalid a tax (construed by the Supreme Court of Texas as an occupation tax) measured by the gross receipts of railroads operating in this State. The entire gross receipts of all railroads whose lines were entirely within the State, were included. Our Supreme Court upheld the tax chiefly upon the authority of State of Maine v. Grand Trunk Ry., 142 U.S. 217, 12 S.Ct. 121, 163, 35 L.Ed. 994. State v. G., H. & S. A. R. Co. et al., 100 Tex. 153, 97 S.W. 71. In reversing that decision, the Federal Supreme Court distinguished the Maine case on the ground that the tax there in question was in lieu of all other taxes, except buildings, lands and fixtures outside the right of way, which were taxed locally, and the gross receipts from both inter and intrastate business were employed merely as a measure of the value of the company's property (other than that stated) situated within the State. That decision was in 1908, the opinion being by Mr. Justice Holmes. Four Justices, including the Chief Justice (Fuller, Harlan, White and McKenna) dissented. The syllabus, which embodies the gist of the holding, reads: "The state cannot impose the tax levied by Texas act of April 17, 1905, upon railway companies whose lines lie wholly within the state, 'equal to 1 per centum of their gross receipts,' where a part and, in some cases, much the larger part, of these gross receipts, is derived from the carriage of passengers and freight coming from, or destined to, points without the state."

The decision was rested upon the holding in Philadelphia & S. M. S. S. Co. v. Pennsylvania, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200, and it was stated that in the Maine case the authority of the Pennsylvania case "was accepted without question, and the decision was justified by the majority as not in any way qualifying or impairing it. The validity of the distinction was what divided the court."

The above Texas case, Houston B. & T. Ry. Co. v. State, supra, was decided in 1917, Mr. Chief Justice Phillips delivering the opinion. Its decision, based upon the holding of the Federal Supreme Court in the Galveston, H. & S. A. R. Co. case, and holding invalid the act of May 16, 1907, is thus stated in the syllabus: "The tax imposed upon terminal railways by Revised Statutes, 1911, art. 7384 (sec. 16, of the Act of May 16, 1907, Laws, 30th Leg., p. 487) being one per cent of its gross receipts from all sources, including those derived from interstate and foreign commerce, and being in addition to all other taxes imposed by law, though designated as an occupation tax, was unconstitutional as being a tax upon such commerce."

■ We quote from the opinion: "Whether the tax in question is one upon interstate and foreign commerce and hence beyond the power of the State to impose, or is a tax which the State may lawfully exact, is a question controlled by the decisions of the Supreme Court of the United States. The present inquiry re-

solves itself, therefore, simply into the ascertainment of that court's rule of decision upon the subject."

The Stevedoring case, decided in November 1937, was a unanimous decision, opinion by Mr. Justice Cardozo. That decision held invalid a statute of the State of Washington which levied a gross income tax held to be "broad enough to cover the business of a stevedore." [302 U.S. 90, 58 S.Ct. 73, 82 L.Ed. 68]. The holding was that: "A state may not impose an occupation tax on one engaged in the business of loading and unloading vessels engaged in interstate and foreign commerce, by longshoremen subject to his direction and control."

The decision draws a distinction between that portion of the corporation's business described in the above quotation, and that wherein the corporation merely performed the services of furnishing stevedores to the shipowners, the work being done under the latter's directions and employment. The Philadelphia and Galveston, H. & S. A. R. Co. cases above are cited with approval; as they have been in numerous other decisions of that court.

■ As above stated, we regard these decisions as controlling in the instant case.

A very elaborate argument (172 pages) has been filed by the Franchise Tax Attorney of the Secretary of State's Department, in support of appellants' brief. This argument evidences a vast amount of research upon the subject, and reviews and digests numerous decisions of Federal and State courts. The proper limitations of this opinion preclude a detailed consideration of the many contentions urged in this argument and of the authorities cited therein. Nor would it be profitable here to attempt a reconciliation of the holding of the Federal Supreme Court in the above decisions with those in which a contrary holding is arrived at under fact situations which, apparently at least, are somewhat analogous. The Federal Supreme Court has itself distinguished between those cases falling within the above classification, and those which uphold taxes levied (a) upon net income, and (b) upon manufacturing concerns, wherein the gross income is held to be an appropriate measure of value of their products, the manufacture of which is purely intrastate business. In dissenting opinions of Mr. Justice Black in Adams Mfg. Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429, and Gwin, White & Price v. Henneford, 305 U.S. 435, 59 S.Ct. 325, 83 L.Ed. 276, will be found a full discussion of the entire subject, with review and digest of authorities.

■ Upon appellee's third contention: It may be conceded that the expression, "business done in Texas" taken in the abstract, is broad enough to include that segregated portion of interstate business which is wholly performed within the State. But the language must be construed with reference to its context and the subject matter dealt with, as well as the limitations upon the authority of the legislature in enacting the statute. It is a rule of general application that where the language of a statute is susceptible of two constructions, one of which will render it invalid and the other valid, the latter will be adopted. This rule has been frequently applied to this particular language. Pacific Express Co. v. Seibert, 142 U.S. 339, 12 S.Ct. 250, 35 L.Ed. 1035; Ohio Tax Cases, 232 U.S. 576, 34 S.Ct. 372, 58 L.Ed. 737; Southern Pacific Co. v. State Corporation Commission, 41 N.M. 556, 72 P.2d 15; State v. Northern Pac. R. Co., 183 Wash. 33, 48 P.2d 931. Many other cases might be cited. We hold that the language, "business done in Texas," as employed in this statute was intended to mean business begun and completed in Texas, and not business begun in Texas and completed in some other state or foreign nation, or vice versa. In other words, that it means intrastate business.

■ As to appellee's fourth contention: The record shows that from the passage of the act until 1937 its uniform construction by the Secretaries of State and other officials, including the Attorney General, had been that it included only receipts from intrastate business. This admission was made by the officials representing the State in Southern Realty Corp. v. McCallum, D.C., 65 F.2d 934, certiorari denied, 54 S.Ct. 127, a case in which the constitutionality of the statute was attacked on other grounds. Conceding, arguendo, that the language of the act is susceptible of the construction that it embraces inter as well as intrastate business, it manifestly is not so clearly so as not to render it open to construction. Departmental construction may therefore become a determining factor. Especially is this true regarding revenue measures, the administration of which is under con-

stant observation of the legislature. See 39 Tex.Jur., pp. 234–238, §§ 125 and 126.

We have not deemed it necessary to do more than state our views upon appellee's third and fourth contentions because of their relative unimportance under our above holding sustaining the second contention.

The trial court's judgment is affirmed. Affirmed.