**Bob BULLOCK, Comptroller of Public Accounts, et al., Appellants,**

**v.**

**ENSERCH EXPLORATION, INC., et al., Appellees.**

**No. 13217.**

Court of Civil Appeals of Texas, Austin.

April 1, 1981.

Rehearing Denied April 22, 1981.

Mark White, Atty. Gen., Gilbert F. Bernal, Jr., Austin, for appellants.

Mary Joe Carroll, Clark, Thomas, Winters & Shapiro, Austin, for appellees.

PHILLIPS, Chief Justice.

This is a franchise tax case involving the construction of Tex.Tax.—Gen.Ann. art. 12.02(1)(b)(i) enacted in 1969.

This case presents a consolidation of two actions brought by three corporations, Enserch Exploration, Inc., Continental Oil Company, and South Texas Natural Gas Gathering Company, appellees, for the refund of franchise taxes paid under protest to appellant, Bob Bullock, Comptroller of Public Accounts of Texas.[1]

The critical issue is whether appellees' sales of natural gas with deliveries in Texas to interstate pipeline companies for resale outside of Texas constitute "business done in Texas" and are therefore included as appellees' gross receipts for their business done in Texas.

The trial court held that appellees were not liable for the tax. We reverse and render judgment for the State and hold that the tax, as levied, is valid.

## I.

The Texas franchise tax, Tex.Tax.—Gen. Ann. art. 12.01–12.22 (1969), is imposed on every domestic and foreign corporation chartered or authorized to do business within the state or doing business within the state and not specifically exempted from the payment of such tax. For the franchise tax years in question, appellees' taxes were based on the portion of their stated capital, surplus and undivided profits allocated to Texas under Article 12.02. Under Article 12.02, the portion of a corporation's taxable capital allocated to Texas is determined by multiplying such corporation's total taxable capital by a fraction, the numerator of which is the corporation's gross receipts from business done in Texas and the denominator of which is the corporation's total gross receipts.

Article 12.02 is as follows:

"(1)(a) *Each corporation* liable for payment of a franchise tax shall determine the portion of its entire taxable capital taxable by the State of Texas by multiplying same by an allocation percentage which shall be the percentage relationship which *the gross receipts from its business done in Texas* bear to the total gross receipts of the corporation from its entire business.

(b) *For the purpose of this Article, the term 'gross receipts from its business in Texas' shall include:*

(i) *Sales of tangible personal property* when the property is *delivered or shipped to a purchaser within this State, regardless of the F.O.B. point or other conditions of the sale . . .*" (Emphasis added).

Appellees, Enserch and Continental, sell the gas they produce to interstate transmission companies which transport the gas to ultimate destinations located outside of Texas. Appellee, South Texas, purchases natural gas from producers and gathers, transports and sells this gas to interstate transmission companies in Texas which transport the gas to destinations in states other than Texas. There is a continuous and uninterrupted movement of the gas sold through the connecting pipeline of appellee South Texas and its purchasers from

---

1. Audits conducted by the Comptroller of the franchise tax returns for appellees Enserch and Continental's tax years 1969 through 1975 and appellee South Texas' tax periods from May 1, 1969 through April 30, 1976, resulted in the payment under protest of franchise taxes totalling $565,672.14.

the time the gas is acquired by South Texas until it reaches its ultimate destination in another state.

The sales in dispute were made pursuant to Certificates of Public Convenience and Necessity issued by the Federal Energy Regulatory Commission and are subject to the regulatory powers of the Federal Energy Regulatory Commission.

■ Appellants are before us on numerous points of error which, in essence, contend that appellees' gross receipts from sales of natural gas with deliveries in Texas to interstate pipeline companies in Texas, constitute gross receipts from "business done in Texas" under Article 12.02. It is appellants' position that, in spite of the fact that this natural gas is eventually delivered by third parties to destinations outside of Texas, the sale of the natural gas is completed within the state and is therefore taxable. We agree with this conclusion.

It is self-evident from the facts (which were stipulated) that appellees are not sellers of natural gas to out-of-state buyers. These transactions begin and end in Texas. Article 12.02(1)(b)(i) clearly provides that "when the property is delivered or shipped to a purchaser within this State" a sale of such property constitutes gross receipts from business done in Texas, *"regardless of the F.O.B. point or other conditions of sale...."* It makes no difference that the gas eventually moves in interstate commerce. For the purposes of this tax, its status is simply determined by whether such property, when sold, is delivered or shipped to a purchaser within Texas.

The statute in question is clear and unambiguous and means exactly what it says when it is applied to the facts in this case. See *Citizens Nat'l Bank v. Calvert*, 527 S.W.2d 175 (Tex.1975).

## II.

Appellees strongly urge that two former opinions of this Court uphold their theory that the sales in question were not "business done in Texas." They are *Clark v. Atlantic Pipe Line Co.*, 134 S.W.2d 322 (Tex. Civ.App.1939, writ ref'd), and *Flowers v. Pan American Refining Corp.*, 154 S.W.2d 982 (Tex.Civ.App.1941, writ ref'd). In our judgment these cases are not on point.

In *Atlantic*, a franchise tax case, the oil moved through Texas by Atlantic's pipelines and, for the most part, was delivered to the coast to where it was loaded aboard oil tankers which then delivered the oil to the purchasers in other states. The Court said: "We hold that the language, 'business done in Texas,' as employed in this statute was intended to mean business begun and completed in Texas, and not business begun in Texas and completed in some other state or foreign nation, or vice-versa." 134 S.W.2d at 328. It should be noted that the Court felt restrained by *Puget Sound Stevedoring Co. v. State Tax Commission*, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937). That case held that a state could not tax a local activity (stevedoring) that could not be separated from interstate commerce. *Washington Revenue Dept. v. Stevedoring Ass'n*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), overruled that concept. Services that were performed within a state could be taxed by a state even though the services were an integral part of interstate commerce.

Nor would *Pan American* change our view. It is also a franchise tax case holding that the tax cannot be levied on gross receipts from sales of products which were refined or manufactured in Texas but sold outside of Texas. Again, the Court held that "business done in Texas" meant business begun and completed in Texas. Since *Atlantic* and *Pan American*, the Legislature, in 1969, amended the statute to include Art. 12.02(1)(b)(i) which includes in the definition of business done in Texas the "[s]ales of tangible personal property when the property is delivered or shipped to a purchaser within this state *regardless of the F.O.B. point or other conditions of the sale* ..." (emphasis added).

## III.

Next, appellees contend that their view as to liability under the tax in question has

been sustained by long-standing departmental construction of the statute. In this respect, they cite *Humble Oil & Refining Co. v. Calvert*, 414 S.W.2d 172 (Tex.1967), for the proposition that the term "doing business in Texas" contained in Article 12.02 is ambiguous and that prior departmental construction determined that case in spite of a rather nebulous argument of the Comptroller to the contrary. That case involved dividend income from foreign corporations. The statute on those facts was ambiguous. *Humble v. Calvert*, however, was also decided before the 1969 amendment that added Art. 12.02(1)(b)(i). In our judgment, the Legislature has provided the Comptroller with a clear, unambiguous mandate to collect this tax, and this Court is bound to enforce it.

Appellees also contend in their claim of departmental construction that the Comptroller and the Attorney General of Texas have construed Article 12.02, as amended in 1969, as not imposing any tax when petroleum products are delivered to out-of-state purchasers. The Comptroller issued a letter on August 4, 1971, to the Texas Mid-Continent Oil and Gas Association which (although argued to the contrary by the State) apparently ruled that sales of crude oil and gas for ultimate shipment outside of Texas do not constitute receipts from "business done in Texas" for the purpose of calculating and reporting franchise tax. However, after the 1969 amendment set out above was enacted, whatever discretion that was vested in the Comptroller to interpret the law vanished. He was then without any authority to bind the state in any manner *contra* to the explicit dictates of the statute. *Central Power & Light Co. v. State*, 165 S.W.2d 920 (Tex.Civ.App.1942, writ ref'd), *app. dism'd*, 319 U.S. 727, 63 S.Ct. 1033, 87 L.Ed. 1691; *Brown Express, Inc. v. Railroad Commission*, 415 S.W.2d 394 (Tex. 1967); *Eddins-Walcher Butane Co. v. Calvert*, 298 S.W.2d 93 (Tex.1957); *Citizens Nat'l Bank v. Calvert, supra.*

Attorney General's Opinion No. M–829 (1971) discussed only the "receipts from sales of petroleum products refined in Texas and sold and shipped to out-of-state purchasers" where the F.O.B. loading points were in Texas. It did not discuss receipts from sales of petroleum products that were delivered to the purchaser in the state of Texas. The opinion, however, did state that "Article 12.02(1)(b)(i) . . . clearly contemplates that the F.O.B. point shall not control and that *the point where the purchaser actually takes possession of the property shall be the place of delivery for purposes of this statute.*"

Before the 1969 amendment, the courts have consistently held that "business done in Texas" means business that began and ended in Texas. After the 1969 amendment the sale of tangible personal property need not begin in Texas but if the property is delivered to a purchaser in Texas then Art. 12.02 clearly states that it is business done in Texas. Consequently, when it was re-enacted in 1975 without change, this in no way breathed new life into an erroneous opinion issued in the interim. *San Antonio Union Junior College Dist. v. Daniel*, 206 S.W.2d 995 (Tex.1947).

## IV.

■ Appellees contend that the franchise tax on the sale of gas, under the facts described, places an undue burden on interstate commerce and violates the commerce clause. We do not agree. It is clear that a tax on interstate commerce does not violate the commerce clause if certain conditions are met. *Washington Revenue Department v. Stevedoring Ass'n*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

"As was recognized in *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944 (1938), interstate commerce must bear its fair share of the state tax burden. The Court repeatedly has sustained taxes that are applied to activity with a substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are

fairly related to the services provided by the State."

*Stevedoring, supra* at 750, 98 S.Ct. at 1399.

The franchise tax, as applied to these facts, meets those requirements. As stipulated at trial "[o]nly sales of gas with delivery in Texas to interstate pipeline companies for delivery and resale outside of the State of Texas are involved in this cause." Appellees gather, transport, and sell the gas within the state of Texas. Title and possession are transferred within Texas. The appellees have admitted that they are not taxed for these sales in any other state. There is no discrimination against interstate commerce since all such sales of gas whether for ultimate use out-of-state or in-state are considered in computing the franchise tax. There is also no claim that the services provided by the state are not sufficiently related to the tax.

Appellees, nevertheless, claim that *Michigan-Wisconsin Pipe Line Co. v. Calvert*, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954), is on point and is controlling. That case also involved a Texas franchise tax, natural gas and interstate pipelines. The franchise tax, however, was significantly different. It was designed to use the "gathering" of gas, not the sale of gas, in computing the franchise tax. Thus the buyer of the gas was taxed, not the seller. The Court held that "as a basis for finding a separate local activity, the incidence must be a more substantial economic factor then the movement of the gas from a local outlet of one owner into the connecting interstate pipeline of another." *Id.* at 169, 74 S.Ct. at 402. The Supreme Court also noted in footnote 18 of *Stevedoring* that the tax in *Michigan—Wisconsin* was "unconstitutional because it amounted to an *unapportioned* levy on the transportation of the entire volume of gas," *Stevedoring, supra* at 749, 98 S.Ct. at 1398 (emphasis added).

Here the sale of gas, not just the transfer of possession, *is* the basis of the franchise tax. Also, there can be no claim that the tax is unapportioned. The transactions in question took place entirely within Texas. Appellees produced or purchased the gas in Texas and delivered the gas to purchasers within Texas. They have no further connection with the gas after the gas is transported out of the state by the purchaser. No other state could use these transactions as a basis for imposing a tax upon appellees.

The franchise tax does not violate the Supremacy Clause, U.S.Const. art. VI, cl. 2. There can be no real argument that the purpose of the federal regulation of the interstate sale of natural gas is to have reasonable rates for natural gas. The regulations allow the consumer to pay a reasonable price for natural gas and allow the seller to make a reasonable profit. It is *not* the purpose of the federal regulations to shift all the cost of the state services supplied to this industry to the taxpayers of the producing state.

In setting up these regulations Congress clearly intended that the price of natural gas would reflect the reasonable costs of its production and transportation. These costs include the taxes that are reasonably and fairly imposed by a state. *See Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 95 S.Ct. 1538, 44 L.Ed.2d 1 (1975). There is no claim that the franchise tax is not reasonable.

### V.

Finally, appellees contend that they are not liable for the taxes from 1969 to 1975 since the Comptroller is attempting to impose a retroactive law. They claim that Tex. Att'y Gen. Op. No. M–829 (1971) and the Comptroller's August 4, 1971, letter were rules. These rules had the statutory effect of precluding the collection of the taxes in question. Tex. Att'y Gen. Op. No. H–640 (1975) was a reversal of these rules and could not be applied retroactively.

We do not agree. The Comptroller is merely enforcing Art. 12.02 as amended in 1969. Article 12.02 has imposed this tax upon appellees since 1969. There is no retroactive application of Art. 12.02 since all the transactions in question occurred after the 1969 amendment. Erroneous interpretation of a law by the Comptroller or the

Attorney General may not invalidate a clear and unambiguous statute.

 The Comptroller has no authority to promulgate a rule (assuming only for argument that the August 4, 1971, letter was a rule) that is inconsistent with the laws of this state. Tex.Tax.—Gen.Ann. art. 12.12 (Supp.1980), *Citizens Nat'l Bank v. Calvert, supra.* Attorney General opinions are not statutory themselves and may be disregarded by the courts if the statutes that they are based on are clear and unambiguous. *Steakley v. West Texas Gulf Pipeline Co.*, 336 S.W.2d 925 (Tex.Civ.App. 1960, no writ). Also as stated above, we do not believe that Tex. Att'y Gen. Op. No. M–829 is applicable to this case.

The judgment of the trial court is reversed and judgment is hereby rendered for appellants.

Reversed and Rendered.

POWERS, J., not sitting.