# IN THE SUPREME COURT OF TEXAS

══════════

No. 18-0566

══════════

LOCKHEED MARTIN CORPORATION, PETITIONER,

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, RESPONDENTS

══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

══════════════════════════════

**Argued January 30, 2020**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE DEVINE, JUSTICE BLACKLOCK, JUSTICE BUSBY, and JUSTICE BLAND joined.

JUSTICE BOYD filed a dissenting opinion.

This case involves a franchise-tax dispute, but federal law regulating foreign military sales plays a significant role in the resolution of that dispute. Lockheed Martin Corporation manufactured F-16 fighter jets in Fort Worth destined for foreign-government buyers. As required by federal law, the foreign buyers contracted with the U.S. government to purchase the jets, and the U.S. government in turn contracted with Lockheed Martin. The overarching issue is whether Lockheed Martin's receipts from the sales of those jets were properly sourced to Texas for

purposes of calculating its Texas franchise tax.  The trial court and the court of appeals held that they were.  We disagree and reverse the court of appeals' judgment.

## I. Background

Because the transactions giving rise to this tax dispute were structured to comply with federal arms-control laws, we begin with a discussion of that framework.

## A. Regulation of Foreign Military Sales

To support U.S. foreign-policy and national-security objectives, the Arms Export Control Act restricts sales of U.S.-manufactured military goods to foreign governments.  *See* 22 U.S.C. §§ 2751–2799aa-2.  The level of restriction depends on the sensitivity of the "defense articles" being purchased.  *See id.* § 2778.  Approved foreign governments may purchase certain less-sensitive defense articles directly from private contractors with relatively minimal direct government oversight via what are known as "Direct Commercial Sales" transactions.  *See id.*; U.S. DEP'T OF DEF., DEF. SEC. COOPERATION AGENCY, DoD 5105.38-M, SECURITY ASSISTANCE MANAGEMENT MANUAL §§ C4.3.6 (2003) [hereinafter "2003 SAMM"].[1]  Defense articles of greater military sensitivity, including the F-16 fighter jets that are the subject of this suit, are subject to substantially more government oversight and control and may be purchased only through the "Foreign Military Sales" (FMS) program, which is administered by the Department of Defense. *See* 22 U.S.C. §§ 2761–62; *see also* 2003 SAMM §§ C4.1, C4.3.[2]

FMS transactions begin with a "Letter of Request" from a foreign government identifying the defense articles or services the government wishes to purchase.  2003 SAMM § C5.1.1.  The

---

[1] The parties stipulated to the applicability of both the 1988 version of the SAMM and the 2003 version.

[2] Foreign governments may choose to utilize the FMS program with respect to articles that could otherwise be purchased through Direct Commercial Sales transactions.  *See* 2003 SAMM §§ C4.5.8, C4.5.10.

foreign government and the U.S. government then enter into a formal "Letter of Offer and Acceptance" (LOA) that itemizes the defense articles or services the foreign government intends to procure and the terms and conditions of the sale. *See id.* §§ C4.1.1, C5.4.1. LOAs may be "implemented" in one of two ways. First, under certain circumstances the Department of Defense may fulfill the order from its existing stocks. 22 U.S.C. § 2761. Second, the U.S. government may "enter into contracts for the procurement of defense articles" from private contractors. *Id.* § 2762; *see also* 2003 SAMM § C4.3.1 (explaining that the Department may enter into procurement contracts "on behalf of eligible foreign countries"). The second "procurement" pathway is at issue here.

Under that pathway, a signed LOA identifies the foreign buyer, sets out the precise design specifications requested, and includes plans for delivery to the buyer. *See* 2003 SAMM fig.C5.F2. The price of the items is set at "the total cost" to the U.S. government of procuring the items, regardless of whether that cost exceeds the LOA's estimate.[3] *Id.* fig.C5.F3; *see* 22 U.S.C. § 2762 (providing that in an FMS sale to a foreign government, the foreign government must provide the U.S. government "with a dependable undertaking (1) to pay the full amount of such contract which will assure the United States Government against any loss on the contract, and (2) to make funds available in such amounts and at such times as may be required to meet the payments required by the contract, and any damages and costs that may accrue from the cancellation of such contract"). Once an LOA is finalized and the foreign buyer remits the initial payment or assurance of payment, the U.S. government is responsible for procuring the items "under terms and conditions consistent

---

[3] The standard LOA terms and conditions include a statement that the buyer "recognizes that the [U.S. government] will procure and furnish the items in this LOA on a non-profit basis for the benefit of the Purchaser." 2003 SAMM fig.C5.F3.

with [Department] regulations and procedures." 2003 SAMM figs.C5.F2–.F3. The U.S. government then contracts with a private contractor to produce the items specified in the LOA.[4] *BAE Sys. Tech. Solution & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 467 (4th Cir. 2018). The LOA allows the United States to terminate or take other action with respect to those contracts without affecting the LOA.[5]

The U.S. Court of Appeals for the Fourth Circuit describes the FMS program as "requir[ing] the intermediation of the United States and a back-to-back contract structure." *Secretary of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007). The structure "reflects the national security interests of the United States" and forecloses implying a direct contractual relationship between the domestic contractor and the foreign purchaser. *See id.*; *see also BAE Sys. Tech.*, 884 F.3d at 467 ("The U.S. government 'determines the contract type, selects the contract source, and negotiates prices and contract terms with individual contractors.'" (quoting DEF. INST. OF SEC. COOPERATION STUDIES, THE MANAGEMENT OF SECURITY COOPERATION (GREEN BOOK) 15-8 (37.1 ed. 2017))).[6] Thus, a procurement purchaser claiming defective items, rather than complaining directly to the contractor, is directed to submit a "supply discrepancy report" to the U.S. government, which "may be able to resolve the problem by seeking

---

[4] The foreign buyer may coordinate and negotiate with a specific U.S. contractor in advance of the LOA and may urge the U.S. government to enter a sole-source contract with the designated contractor. *BAE Sys. Tech.*, 884 F.3d at 468. The U.S. government may, but is not required to, agree to do so. *Id.*

[5] The U.S. government has the power to halt export deliveries of military equipment to foreign purchasers in Direct Commercial Sales as well as FMS transactions. *See* DEF. INST. OF SEC. COOPERATION STUDIES, THE MANAGEMENT OF SECURITY COOPERATION (GREEN BOOK) 15-6 (39.0 ed. 2019).

[6] The Green Book is published by "the agency responsible for providing research support to advance U.S. foreign policy through security assistance." *Trimble Navigation*, 484 F.3d at 704 n.2. It does not set official policy but "is an attempt to summarize security assistance programs and is based on the [Arms Export Control Act] and the *SAMM*, among other sources." *Id.*

resolution through the contractor under the provisions of the . . . procurement contract." *Trimble Navigation*, 484 F.3d at 704 (quoting 37.1 GREEN BOOK 8-11).

### B. The FMS Transactions at Issue

The facts of this case are largely stipulated. Lockheed Martin Corporation is a global security and aerospace company engaged in the research, design, development, manufacture, integration, and sustainment of advanced technological systems, products, and services. Lockheed Martin operates a manufacturing facility in Fort Worth, where it produces military aircraft for both the U.S. government and certain approved foreign governments. During the franchise-tax report years 2005 to 2007, Lockheed Martin delivered a number of F-16 fighter jets that it had developed and produced at that facility for the governments of Chile, Greece, Israel, Oman, and Poland. As required by the Arms Export Control Act, the sales of the F-16s were handled through the FMS program described above. Thus, each sale was effected through two contracts: one between Lockheed Martin and the U.S. government, and one (the LOA) between the U.S. government and the foreign buyer.

The contracts between Lockheed Martin and the U.S. government identified the respective foreign buyers and called for the jets to be designed to the buyers' specifications, including integrating certain equipment furnished by the foreign buyers. A Ferry Plan associated with each transaction "define[d] events, tasks, and personnel associated with the delivery of [the] aircraft from Lockheed Martin . . . to [the foreign buyer]." Transfer of legal title to each of the F-16s occurred at Lockheed Martin's Fort Worth facility upon the execution of a Material Inspection and Receiving Report (DD250) by an authorized U.S. government representative. The executed DD250 signified the U.S. government's "final acceptance of the aircraft . . . as meeting the

applicable contractual requirements." Lockheed Martin was then authorized to request payment, which was made by the U.S. government "out of funds the foreign buyer ha[d] on deposit . . . or based upon a 'dependable undertaking' by that foreign government."

In the next step of the transaction, the U.S. government representative signed a Requisition and Invoice/Shipping Document (DD Form 1149) documenting transfer of possession and control of the aircraft to the U.S. government.[7] Another form, the Aerospace Vehicle Delivery Receipt (AFTO 290), documented the transfer of possession and control of the aircraft to a U.S. government pilot responsible for transporting it to the purchasing foreign government. A representative of that government countersigned the AFTO 290 upon final delivery of the aircraft. Pursuant to the Ferry Plan, Lockheed Martin retained certain obligations throughout the delivery process, such as providing "technical assistance" at intermediate locations and additional "on-site assistance and liaison support" at such locations as "necessary to allow uninterrupted delivery."

### C. Procedural History

The current dispute began when Lockheed Martin filed a claim with the Comptroller for a refund of the portion of its franchise taxes for the tax years 2005 through 2007 attributable to the sales of the F-16 aircraft described above. Lockheed Martin claimed that the receipts from its sales of those aircraft did not qualify as "Texas gross receipts" for purposes of apportioning taxable earned surplus and requested a refund of $2,671,154.83, plus interest. The Comptroller denied the claim. After exhausting its administrative remedies, Lockheed Martin brought this suit.

---

[7] The trial court found that upon such transfer of legal title, possession, and control, the U.S. government assumed all risk of loss for the F-16s at issue. The parties also stipulated that the foreign purchaser typically agrees in an LOA (1) to assume all risk of loss or damage to the aircraft and (2) to indemnify the U.S. government for any loss or damage to the aircraft for which the U.S. government is contractually responsible.

6

The trial court held a bench trial and rendered judgment for the Comptroller. The trial court found that the sales of the F-16s at issue were completed within Texas and that the receipts from those sales are Texas receipts; thus, the court concluded that Lockheed Martin was not entitled to a refund. The court of appeals affirmed. 550 S.W.3d 855, 857 (Tex. App.—Austin 2018). We granted Lockheed Martin's petition for review.

## II. Analysis

### A. Standard of Review

A tax-refund claimant who exhausts administrative remedies may sue the Comptroller and obtain de novo judicial review of the claim. *See* TEX. TAX CODE §§ 112.151, .154. On such de novo review, the burden of proof is on the claimant to prove entitlement to a refund. *See Key W. Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 846 (Tex. 1961) ("Review by trial de novo has all the attributes of an original action in the reviewing court."). Accordingly, to warrant appellate reversal of a trial court's judgment in favor of the Comptroller, the evidence must conclusively establish the material facts entitling the claimant to the refund it seeks. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) ("When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."). Here, Lockheed Martin must demonstrate that the evidence conclusively establishes that the receipts from the sales of the F-16s at issue are not properly sourced to Texas.

That said, as the court of appeals and the parties recognize, the material facts are essentially undisputed, and the outcome of the case hinges on the proper interpretation of former section

171.1032 of the Texas Tax Code. Statutory interpretation is, of course, an issue of law that we review de novo. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016).

## B. Franchise Tax

We have described the Texas franchise tax as a tax on the privilege of doing business in Texas. *In re Nestle USA, Inc.*, 387 S.W.3d 610, 621–22 (Tex. 2012). For the tax years at issue, an entity was required to pay Texas franchise tax on its "earned surplus" apportioned to Texas. *See* Former TEX. TAX CODE §§ 171.002,[8] .106(b);[9] *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 437 (Tex. 2011) (explaining that "[b]efore 2008, the franchise tax was imposed on an entity's capital or earned surplus," while the Tax Code "presently imposes franchise tax on an entity's 'taxable margin'"). That portion was determined by "multiplying the taxable earned surplus by a fraction, the numerator of which is the corporation's gross receipts from business done in this state, as determined under [former] Section 171.1032, and the denominator of which is the corporation's gross receipts from its entire business." Former TEX. TAX CODE § 101.106(b).[10] In turn, former section 171.1032 described the receipts that must be added for inclusion in the numerator of the apportionment fraction. *Id.* § 171.1032.[11] As relevant here,

---

[8] *See* Act of June 1, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1691 (as amended in 1984, 1987, 1991, 1997, 1999) (codified at TEX. TAX CODE § 171.002). Citations to former sections 171.002, 171.1032, and 171.106 of the Tax Code are to the versions in effect during the pertinent tax years.

[9] *See* Act of June 1, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1698 (as amended in 1991, 1997, 1999, 2001, 2003) (codified at TEX. TAX CODE § 171.106).

[10] The current version of section 101.106 similarly instructs that apportioning "margin" to Texas is done by "multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business." TEX. TAX CODE § 101.106.

[11] *See* Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.06, 1981 Tex. Gen. Laws 156–57 (as amended in 1993, 1997, 2001, 2003) (codified at TEX. TAX CODE § 171.1032), *repealed by* Act of May 15, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 8, 19 (recodified at TEX. TAX CODE § 171.103).

"gross receipts of a corporation from its business done in this state" include "each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point[12] or another condition of the sale." *Id.* § 171.1032(a)(1).[13]

### 1. Identity of the Buyer

The parties' dispute has largely focused on the identity of the relevant "buyer" for purposes of former section 171.1032. Lockheed Martin asserts that, in a cohesive FMS transaction involving the manufacture and sale of military goods to a foreign government, that foreign government is the "buyer," and the sale therefore does not generate Texas receipts. The Comptroller responds that FMS transactions involving procurement consist of two distinct sales: the contractor's sale of the military goods to the U.S. government, and the U.S. government's resale of those goods to the foreign purchaser. Thus, the Comptroller contends that the U.S. government was the "buyer" and that Lockheed Martin's sales of the aircraft to the U.S. government were completed within Texas, thereby generating Texas receipts. The parties further dispute whether former section 171.1032(a)'s applicability to sales in which "the property is delivered or shipped to a buyer in this state" denotes a "location of delivery" test or a "location of buyer" test; that is, does apportionment hinge on whether delivery occurred in Texas or whether the buyer was in Texas?

---

[12] Under the Uniform Commercial Code, the "FOB [or 'free on board'] point" is the designated location to which the seller bears the expense and risk of transporting the goods. *See* TEX. BUS. & COM. CODE § 2.319. For example, "when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this chapter . . . and bear the expense and risk of putting them into the possession of the carrier." *Id.* § 2.319(a)(1).

[13] The current version of the Tax Code similarly takes into account, in apportioning an entity's taxable margin based on gross receipts from business done in this state, the entity's receipts from "each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale." TEX. TAX CODE § 171.103(a)(1).

9

The court of appeals agreed with the Comptroller that the U.S. government is the relevant buyer, that Lockheed Martin's sales to the U.S. government were completed within Texas, and that the receipts from those sales were thus properly sourced to Texas. 550 S.W.3d at 868–71. Noting the absence of privity of contract between Lockheed Martin and the foreign countries, the court concluded that Lockheed Martin "inescapably 'sold' or made 'sales' of the aircraft in question to the U.S. government" and that "any subsequent or related transactions between the U.S. government and the foreign governments" do not alter the fact that those sales "begin and end in Texas." *Id.* at 868–69 (internal quotations omitted).

Both the court of appeals and the parties rely to some extent on the Third Court of Appeals' decision in *Bullock v. Enserch Exploration, Inc.*, 614 S.W.2d 215 (Tex. App.—Austin 1981, writ ref'd n.r.e.). In that case, taxable entities sold natural gas to interstate transmission companies in Texas and delivered the gas to those companies in Texas. *Id.* at 216. The transmission companies transported the gas out of state and resold it to out-of-state purchasers. *Id.* at 216–17. The court held that the taxable entities were "not sellers of natural gas to out-of-state buyers" and that the entities' transactions with the transmission companies began and ended in Texas. *Id.*

The court of appeals in this case held that under *Enserch*, the U.S. government's resales of the F-16s at issue to foreign governments did not "convert the identity of Lockheed Martin's 'buyer'" to those foreign governments. 550 S.W.3d at 869. The court further cited the federal case law discussed above regarding the absence of contractual privity between Lockheed Martin and the foreign governments, concluding that while the U.S. government "to some extent does act 'on behalf of' a foreign government or akin to a hired purchaser when conducting FMS procurements," the governing framework for those procurements serves the U.S. government's

10

national-security and policy interests and gives the government "ultimate power and control over the transactions relative to the foreign nations' respective interests." *Id.* at 869–70. The Comptroller defends the court of appeals' analysis as properly reflecting the structure of the FMS program, which purposefully interposes the U.S. government between contractors and foreign customers in a "mandatory sale-for-resale transaction."

Lockheed Martin disputes the characterization of an FMS procurement as a typical "sale for resale" akin to the transaction at issue in *Enserch*. Lockheed Martin notes that (1) the defense articles being purchased never enter the U.S. government's inventory, (2) FMS buyers specify up front what they wish to buy and remit payment or assurance of payment before the Defense Department approaches a contractor to manufacture the items, and (3) the U.S. government is statutorily forbidden from bearing any profit or loss from an FMS procurement sale. Lockheed Martin further emphasizes the fact that the foreign buyer supplies design specifications and directives to procure components from certain vendors, sometimes even requiring incorporation of buyer-supplied equipment. Noting that "[w]ithout a foreign buyer, there is no Foreign Military Sale," Lockheed Martin characterizes an FMS procurement sale as a single transaction, "initiated by a foreign-government buyer and effectuated by two interrelated, interdependent contracts, with the United States overseeing the transaction, not as mere reseller, but as sovereign." For the reasons discussed below, we agree with Lockheed Martin's characterization of the transaction.

As an initial matter, we take no issue with *Enserch*'s general holding that a sale of goods to a Texas purchaser is not transformed into a sale to an out-of-state buyer merely because the Texas purchaser resells the goods to that out-of-state buyer. *See* 614 S.W.2d at 217. However, in the unique circumstances presented by the FMS transactions at issue, Lockheed Martin is correct

11

that the pertinent "buyers" for Texas franchise-tax purposes are the foreign governments for whom the aircraft were manufactured and to whom they were ultimately delivered. Again, in apportioning business done in Texas, a corporation's Texas receipts include "each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale." Former TEX. TAX CODE § 171.1032(a)(1). Lockheed Martin argues that, for defense articles governed by FMS procurement obligations, the requirement that the U.S. take intermediate title to the goods is a "condition of the sale" to the foreign government that is disregarded for franchise-tax purposes. We agree.

A "condition" is "something that exists as an occasion of something else: a circumstance that is essential to the appearance or occurrence of something else." *Condition*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). When a foreign government wishes to purchase certain particularly sensitive military goods manufactured by U.S. contractors, federal law mandates that the sales be effected by two contracts, as the trial court found happened in this case. In this way, the U.S. government essentially acts as a required intermediary, allowing it to retain maximum oversight over the transaction in service of national-security interests. *See Trimble Navigation*, 484 F.3d at 707; *see also* 550 S.W.3d at 869–70 (recognizing that, at least to some extent, the U.S. government acts on behalf of a foreign purchaser when conducting an FMS procurement but retains ultimate control over the transaction). Thus, the U.S. government's involvement is "essential" to the sale of goods that may be purchased only through the FMS program, including the F-16s at issue. Because the sale of the F-16s could not occur without that involvement, the federal mandate is a statutory "condition of the sale" that we disregard for franchise-tax purposes.

12

Moreover, an FMS procurement transaction does not fit the "sale for resale" paradigm on which the court of appeals relied in *Enserch*. The Comptroller does not dispute that the F-16s at issue were "custom built" and "uniquely designed" to the foreign buyers' specifications. Lockheed Martin was paid "out of funds the foreign buyer ha[d] on deposit with the [U.S. government] as part of the FMS program or based upon a 'dependable undertaking' by that foreign government based on which the [U.S. government] ha[d] extended to it credit for the funds." The price of the items tracked the cost to the U.S. government, which neither profits from nor takes a loss on an FMS procurement transaction.[14] *See* 22 U.S.C. § 2762. For franchise-tax purposes, the U.S. government's role was as a statutorily mandated intermediary, albeit an intermediary with ultimate authority over the transaction.

Our holding is also consistent with Texas's use of a single-factor franchise-tax apportionment method premised on sales. *Gen. Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 864 (Tex. App.—Austin 1996, writ denied) (citing TEX. TAX CODE § 171.106). Generally, a sales-factor apportionment formula is intended "to reflect the contribution of the market state to the taxpayer's income." JEROME R. HELLERSTEIN ET AL., STATE TAXATION ¶ 9.18[3][a] (3d ed. 2019). Unlike a typical sale-for-resale middleman that serves as an intermediate market for goods, the U.S. government was never the "market" for the F-16s at issue. Rather, the "market" all along was the purchasing foreign governments.[15]

---

[14] The Comptroller points out that the U.S. government benefits from FMS transactions in ways other than monetary profit, such as facilitating U.S. military objectives and global relationships and achieving cost-reducing economies of scale in securing defense equipment for U.S. allies. While that may be true, it does not make the U.S. government the market for the defense articles it procures at the behest of those allies.

[15] The dissent summarily discounts the distinctions between the FMS transactions at issue and typical sale-for-resale transactions as irrelevant to whether the U.S. government was "a buyer" under the Tax Code. *Post* at ___. To the contrary, the fact that the U.S. government incurs no profit or loss on the transaction and pays only from funds

The court of appeals cited several cases for the proposition that "federal courts have rejected, in a variety of contexts, similar invitations to disregard or 'pierce' the two-contract structure of FMS transactions." 550 S.W.3d at 869. For example, in *Trimble Navigation*, the Fourth Circuit held that a foreign government in an FMS transaction cannot sue the U.S. contractor directly as a third-party beneficiary of the procurement contract. 484 F.3d at 707. And in *United States ex rel. Campbell v. Lockheed Martin Corp.*, the district court rejected Lockheed Martin's argument that the False Claims Act did not apply to its alleged fraudulent claims for payment from the U.S. government in an FMS transaction, holding that the fact that the claims were paid out of funds deposited by the foreign government was irrelevant because the United States had a contractual obligation to pay and used funds in the U.S. Treasury to do so. 282 F. Supp. 2d 1324, 1338, 1340–41 (M.D. Fla. 2003).

Lockheed Martin argues that "whether a relationship exists between parties sufficient to assign contractual or tort duties and liabilities is irrelevant to identifying a buyer for Texas franchise-tax purposes." Again, we agree. Our holding is premised on a state statute governing payment of state taxes. Recognizing the foreign government as the pertinent "buyer" for purposes of sourcing receipts from FMS transactions for state franchise-tax purposes comports with the plain language of the Tax Code and, importantly, does not affect the FMS program or the important national-security purposes it serves. *Cf. Trimble*, 484 F.3d at 702 (noting that affording an FMS purchaser third-party beneficiary status "is contrary to the structure and intent of the Foreign Military Sales program").

---

deposited by the foreign buyer (or based on a dependable undertaking by that buyer) only serves to highlight that the U.S. government's role is a "condition of the sale" of defense articles to a foreign government.

14

In sum, we hold that Lockheed Martin's "sale" of each F-16 at issue was to the respective foreign-government "buyer" for whom the aircraft was manufactured and to whom it was ultimately delivered. The U.S. government's involvement in each transaction was a "condition of the sale" that has no bearing on whether to apportion the receipts from that sale to Texas.[16]

### 2. Were the F-16s at issue "delivered or shipped to a buyer in this state"?

The Comptroller argues that even if the foreign governments are the relevant buyers of the F-16s at issue, the aircraft were "delivered" in Texas and thus the receipts from the sales of those aircraft are properly sourced to Texas. *See* Former TEX. TAX CODE § 171.1032(a)(1) (Texas receipts include "each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale"). The Comptroller argues that "in this state" modifies "delivered or shipped" such that the place of delivery controls for apportionment purposes even if the buyer is located out of state. Here, the Comptroller contends, the place of delivery was Lockheed Martin's Fort Worth manufacturing facility, where title to the F-16s was transferred to the U.S. government. Lockheed Martin takes the position that "in this state" modifies "buyer," meaning that the product's ultimate destination—the buyer's location—determines sourcing.

We need not resolve this dispute. Because the foreign governments are the buyers for franchise-tax purposes, even under the Comptroller's interpretation the sales are properly sourced to Texas only if the aircraft were delivered to the foreign governments in Texas. The record belies that conclusion. As the parties stipulated, after title and possession shifted to the U.S. government

___

[16] The Comptroller notes that Lockheed Martin does not argue that its receipts are taxable to the foreign government and that concerns of double taxation are not raised here. We agree, but we fail to see how that point is relevant to the analysis.

in Fort Worth,[17] a U.S. government pilot took responsibility for "ferrying the aircraft to the purchasing foreign government." Upon the aircraft's arrival in the foreign country, the "receiving" foreign government countersigned the AFTO 290 form to document "receipt, delivery, and transfer of possession of the aircraft from the [U.S. government] to the foreign government."

Those stipulations confirm that the F-16s at issue were delivered to the "buyers" outside of Texas. Accordingly, the receipts from the sales of those aircraft are not properly sourced to Texas under either party's interpretation of the apportionment statute.

### III. Conclusion

Both the trial court and the court of appeals erred in holding that Lockheed Martin's receipts from the sales of the F-16s at issue qualify as "gross receipts from business done in this state." We hold that Lockheed Martin conclusively demonstrated its entitlement to a refund of franchise taxes for the pertinent tax period. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** May 1, 2020

---

[17] As noted, the "FOB point" is irrelevant to the sourcing determination. Former TEX. TAX CODE § 171.1032.